IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE GUARDIANSHIP & CONSERVATORSHIP OF GABEL


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE GUARDIANSHIP OF & CONSERVATORSHIP OF CHARLES L. GABEL,
AN INCAPACITATED PERSON.

HERITAGE BANK, CONSERVATOR, APPELLANT,
V.
JERI WICHERT AND JAMES GABEL, APPELLEES.


IN RE CHARLES L. GABEL REVOCABLE TRUST.

HERITAGE BANK, APPELLANT,
V.
JAMES GABEL, APPELLEE.


Filed November 24, 2015.    Nos. A-15-190, A-15-191.


Appeal from the County Court for Cass County: JOHN F. STEINHEIDER, Judge. Affirmed.

Kent E. Rauert and Christopher M. Johnson, of Svehla Law Offices, P.C., L.L.O., for appellant.

Thomas E. Whitmore, of Whitmore Law Office, L.L.C., for appellees.


PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Jeri Wichert filed a petition in the county court for Cass County seeking a guardianship and conservatorship for her father, Charles L. Gabel. Initially, Charles contested the petition, but ultimately the parties reached agreements pursuant to which the court appointed Heritage Bank as conservator for Charles and dismissed the remainder of the petition. Jeri and her brother James Gabel, who had paid a portion of the attorney fees incurred pursuing the petition, then applied for

payment of attorney fees out of Charles' estate, which the court approved. Heritage Bank appeals, contending that the county court erred in approving payment of the fees. For the following reasons, we affirm.

BACKGROUND

As an initial matter, we note that Heritage Bank filed two appeals, which this court consolidated on its own motion after briefing was completed. The first appeal (case No. A-15-190) arises out of proceedings on the guardianship and conservatorship petition filed by Jeri, which was docketed in the county court as case No. PR14-27. The second appeal (case No. A-15-191) arises out of proceedings on a petition for trust administration filed by James, which was docketed in the county court as case No. PR14-34. Attorney Thomas Whitmore represented Jeri and James in the two separate proceedings, and the county court awarded attorney fees to Whitmore in both proceedings. Although Heritage Bank appeals in both cases, it filed identical briefs in the appeals, and none of its assignments of error concern the fees awarded in the trust administration proceedings. Therefore, we do not discuss the trust administration proceedings any further.

Jeri filed the petition for a guardianship and conservatorship on April 18, 2014. She alleged that Charles, born in 1936, was diagnosed with Alzheimer's on August 30, 2012, and was incapable of making decisions about his affairs or property. Jeri further alleged that due to Charles' incapacity and a "schism" among his children, Charles' farm assets were in danger of dissipation if a conservator was not appointed. The petition sought appointment of Jeri as temporary and permanent guardian and Core Bank Trust (Core Bank) as temporary and permanent conservator.

In an ex parte order entered on April 18, 2014, the county court appointed Jeri temporary guardian but did not appoint a temporary conservator.

On May 9, 2014, through his attorney, Charles filed an answer to the petition denying that he was incapacitated and that a guardianship or conservatorship was necessary. Charles alleged that on July 26, 2013, he executed a power of attorney naming one of his daughters, Jolene Jefferies, as his attorney in fact and revoking a 2007 power of attorney that had named James his attorney in fact. Charles further alleged that he lived with Jolene in South Bend, Nebraska, and was satisfied with his living arrangements. In the event that the court determined that a guardian or conservator was necessary, Charles requested that Jolene be appointed.

A hearing on Jeri's petition was held on May 9, 2014. At the hearing, the parties advised the court that they had reached an agreement, which they read into the record. In an order dated May 16 reflecting the parties' agreement, the court (1) denied Jeri's request for a temporary guardian and terminated the letters of temporary guardianship issued to Jeri on April 18; (2) appointed Core Bank as Charles' temporary conservator until August 13; (3) ordered Charles to undergo a neuropsychological evaluation by May 23; and (4) temporarily suspended Charles' powers of attorney, except for a health care power of attorney naming Jolene as his attorney in fact for health care. The record reflects that the neuropsychological evaluation was completed, but the results are not contained in the record.

The temporary letters of conservatorship were issued to Core Bank on May 16 and granted Core Bank limited powers. Notably, Core Bank was not permitted to pay compensation to itself or

its attorney from Charles' estate without providing notice to interested persons and obtaining an order of the court.

On July 31, 2014, Jeri filed an amended petition for appointment of a permanent conservator, alleging that Core Bank intended to resign as temporary conservator and requesting that Great Western Bank be appointed permanent conservator. Charles opposed the petition on the same grounds as before.

On August 13, 2014, a hearing was held on Jeri's amended petition. The record does not contain a bill of exceptions for the hearing; however, the court's order entered August 26 indicates that at the hearing the parties advised the court that they had reached an agreement. Reflecting the parties' agreement, the August 26 order (1) terminated the powers of attorney naming James and Jolene as Charles' attorneys in fact, but left intact the health care power of attorney naming Jolene as his attorney in fact for health care; (2) removed Core Bank as temporary conservator and appointed Heritage Bank as permanent conservator; and (3) clarified that Jolene would continue to be responsible for Charles' care. The order stated that the "factual basis for the appointment of [a] conservator is that Charles Gabel agrees he is unable to manage his property and property affairs effectively."

Following the appointment of Heritage Bank as conservator, three applications for fees from Charles' estate were filed. First, Core Bank filed an application for a temporary conservator's fee. Second, Jeri and James jointly applied for payment of attorney fees incurred in connection with the petition for guardianship and conservatorship. The itemized invoice attached to the application reflected that James had paid $9,000 to Whitmore and that Whitmore's outstanding fees were $18,790.12. Third, James applied to be reimbursed for the $9,000 in fees he paid to Whitmore. In addition to representing Jeri and James, Whitmore represented Core Bank in its fee application. Heritage Bank contested all three applications for fees.

A hearing on the fee applications was held on November 7 and 12, 2014. Because on appeal Heritage Bank does not challenge the temporary conservator's fee awarded to Core Bank, we omit a discussion of the testimony related solely to that issue.

At the hearing, Heritage Bank made a brief opening statement outlining its objections to Jeri and James' fee application, which we summarize to provide context to the testimony that follows. In sum, Heritage Bank contested Whitmore's attorney fees on the grounds that (1) the petition for guardianship was unsuccessful; (2) the conservatorship was unnecessary; (3) the petition for guardianship and conservatorship was not brought in good faith but was brought to benefit James; and (4) the attorney fees were incurred for Whitmore's representation of James, Jeri, and Core Bank, none of whom were working in Charles' best interest.

Whitmore testified that James and Charles conducted a farming operation together for a number of years and grew it into a complex enterprise. Much of the farm property was held in the Charles L. Gabel Revocable Trust (the Trust). Whitmore testified that in 2012, Charles resigned as trustee of the Trust, and James began acting as successor trustee and as Charles' power of attorney. Subsequently, Charles named Jolene as successor trustee and gave her the power of attorney. A "deep conflict" then developed in the family, which was very disruptive to the farming operation and, as a result, to Charles' financial standing. According to Whitmore, the guardianship and conservatorship petition was filed so that Charles' mental competency could be evaluated and

an impartial third party could "seize the reins and get the farming enterprise back on track." Whitmore testified that the attorney fees sought were incurred between April 9, 2014, and the date of the hearing and were based on his hourly rate of $200 and his law clerk's hourly rate of $110. Whitmore also introduced his resume into evidence.

On cross-examination, Whitmore acknowledged that the itemized invoice attached to the application for fees was addressed to James. According to Whitmore, James retained him to file the guardianship and conservatorship petition. As noted above, however, the guardianship and conservatorship petition was filed in Jeri's name, a fact that Whitmore did not address.

Whitmore further testified that the invoice included fees for services performed for Core Bank. For example, some of Whitmore's entries pertained to a replevin action filed by AGCO Finance, LLC (AGCO), against Charles, James, and a number of other entities to obtain possession of a combine that Charles purchased from AGCO in September 2012 for $245,000. According to Whitmore, during Core Bank's time as temporary conservator, Whitmore prepared a settlement offer in the combine dispute and sought Core Bank's approval of it, which he obtained. When asked whether he was representing Core Bank at that time, Whitmore testified that he "wasn't giving them advice, but [he] was trying to resolve the issue; so it was good for [James]; good for Charles; [and] good for Core Bank." Whitmore stated, "So who did we do that for? I don't know. It gets kind of muddy sometimes around the edges."

Whitmore also explained entries on his invoice relating to grain contracts in which Archer Daniels Midland (ADM) agreed to purchase several thousand bushels of soybeans and corn at fixed prices from the Trust and from MCGFF, LLC (MCGFF), an entity allegedly owned by Charles and James (Charles disputes James' ownership). The record reflects that in early 2014, ADM threatened to cancel the contracts due to concern over the Trust and MCGFF's ability to supply the grain, which placed the Trust and MCGFF at risk of losing over $550,000. The record further reflects that in June 2014, Core Bank, as temporary conservator and temporary successor trustee, petitioned for bankruptcy on behalf of the Trust and MCGFF to avoid cancellation of the ADM contracts. According to Whitmore, some of the entries on his invoice were for attending hearings in the bankruptcies and for corresponding and conferring with James, Jeri, and Core Bank about the bankruptcy proceedings.

J. Terry Macnamara testified that he had worked as an attorney at McGrath North since 1985 and in the trust department of First National Bank for 20 years prior to that. He was familiar with Whitmore's professional experience and had reviewed the court file for this case. According to Macnamara, the attorney fees reflected in Whitmore's invoice were reasonable and proper, taking into consideration the nature of the case; the time, labor, and skill required; the novelty and difficulty of the issues raised; the results achieved; the character and standing of the attorney; and the customary charges for similar services.

Jeri and James rested, and Heritage Bank called Donald Furlow as its first witness. Furlow testified that he represented AGCO in the replevin action to obtain possession of the combine. According to Furlow, the action was initiated after the January 2014 payment was missed and attempts to have the combine returned voluntarily failed. Furlow said that the combine was in James' possession and that it was not recovered from him until October 2014, when Heritage Bank, acting as conservator, negotiated its return.

Troy Lindsley testified that he was the branch manager of Cornerstone Bank (Cornerstone) in Stromsburg, Nebraska. In 2010, Cornerstone extended a line of credit to MCGFF; the accompanying promissory note was signed by Charles individually and as trustee of the Trust. According to Lindsley, the promissory note was renewed annually, and the note executed in March 2012 was signed by Charles individually and as trustee of the Trust and by James individually and on behalf of C.J. Feedyard, LLC; C.J. Land & Cattle, LP; and Gabel Feedyard, LLC. The principal amount of the note was $1,350,000, and it was secured by real estate owned by Charles and the Trust. Lindsley testified that the note came due at the end of 2012, but the payment was not made. In June 2013, an agreement was executed extending the note's maturity date to July 2013. According to Lindsley, after the note was not paid in July, Cornerstone initiated a foreclosure action against the real estate securing the note. Subsequently, two trustee's sales were scheduled but postponed for various reasons, including MCGFF's bankruptcy. Lindsley testified that after becoming conservator, Heritage Bank fulfilled the ADM grain contracts and used the proceeds to pay a portion of MCGFF's debt. By the time of the hearing, the promissory note had been paid in full.

Jolene testified that she was one of Charles' seven children and that Charles had been living at her home in South Bend since July 2013. Charles was happy living with her and freely moved around the house and used a scooter outside. According to Jolene, Charles did not get lost; he knew exactly who he was, where he was, what he was doing, and what his thoughts were.

Jolene testified that Charles executed a power of attorney in July 2013 naming her as his attorney in fact. The next month, in August, James filed a petition for guardianship and conservatorship for Charles in Polk County, Nebraska. In November, when Jolene and Charles went to attend a hearing on James' petition, there was an altercation between Charles and James at Charles' former home in Osceola, Nebraska. As a result of the altercation, James was charged with assault and obstruction of a peace officer. In January 2014, James voluntarily dismissed the guardianship and conservatorship petition filed in Polk County.

Jolene further testified that in the first nine months that Charles lived with her, she took him to 21 doctors' appointments. According to Jolene, Charles had not been well taken care of previously, so he needed a lot of follow-up appointments. She ensured that Charles took his medications regularly.

Sam Moyer testified that he was president and chief executive officer of Heritage Bank and was carrying out the bank's duties as Charles' conservator. After the bank was appointed conservator, Moyer met with Charles and James separately and reviewed documents to learn about all of the business entities involved in the farming operation. Moyer learned about the combine and associated replevin action and about the ADM grain contracts that were at risk of cancellation. Moyer negotiated with AGCO's attorney and James' attorney for the return of the combine. In exchange for $25,000 and the return of the combine, AGCO agreed to relieve Charles of any deficiency on the retail installment contract that Charles signed when he purchased the combine. Moyer also negotiated with ADM to allow MCGFF to fulfil the grain contracts. Moyer borrowed $280,000 for 25 days, which he used to purchase grain to fulfill the contracts, which resulted in receiving contract payments from ADM totaling roughly $640,000. Moyer used the proceeds to pay down MCGFF's debt to Cornerstone.

Moyer further testified that he opposed the application for fees filed by Jeri and James because he did not believe that the petition for guardianship was necessary or successful. Moyer explained that Charles had a health care power of attorney that was sufficient to handle his affairs. Moyer also believed that the petition for conservatorship was unnecessary because Charles had a power of attorney and an attorney who together were capable of managing his affairs. Moyer believed that some of the entries on Whitmore's invoice, including those related to the bankruptcies and the ADM contracts, reflected business-related services that benefited either MCGFF or James and were unrelated to pursuing a conservatorship. Furthermore, Moyer did not believe that any services that Whitmore provided to Core Bank were related to pursuing the conservatorship. Moyer also did not believe that it had been necessary for Core Bank to petition for bankruptcy on behalf of MCGFF and the Trust.

After Heritage Bank rested, James testified in rebuttal. He testified that he began farming with Charles after graduating from high school in 1975. As the farming operation grew, James and Charles broke the operation into a number of business entities on the advice of their accountant and attorney. James negotiated the original grain contracts with ADM, under which grain was due to be delivered in fall 2013 or winter 2014. In January 2014, ADM threatened to cancel the contracts, and James' response was to have MCGFF petition for bankruptcy. In April, James petitioned for bankruptcy on behalf of MCGFF, but the bankruptcy court dismissed the petition. According to James, it then became necessary to file the conservatorship petition to "protect" the ADM contracts. Once Core Bank was appointed temporary conservator, it refiled for bankruptcy on behalf of MCGFF. James testified that the bankruptcy prevented ADM from cancelling the contracts and allowed the conservator to negotiate with ADM to fulfill the contracts.

James testified that there was also a bankruptcy petition filed on behalf of the Trust. As with the bankruptcy filed on behalf of MCGFF, initially James petitioned for bankruptcy on behalf of the Trust, but James' petition was dismissed. Subsequently, Core Bank as temporary conservator and successor trustee refiled the bankruptcy petition. The reason for the Trust's bankruptcy was to stop the trustee's sales of the farm real estate held by the Trust, which were scheduled after Cornerstone initiated foreclosure proceedings. According to James, the trustee's sales would have been very detrimental to the Trust because of capital gains taxes of "over 50 percent" on the real estate.

James testified that "one of the main reasons for the conservatorship" was the "number of business upsets" that resulted from the "dueling powers of attorney." According to James, the conflict stopped after Core Bank was appointed temporary conservator, which was a benefit to Charles' estate.

James further testified that he used $9,000 of his personal funds to pay Whitmore's attorney fees reflected in the invoice attached to the application for fees.

On cross-examination, James testified that he and Charles had an equal say in the farm operations up until July 2013 when Charles left to live with Jolene in South Bend. Upon further questioning, James testified that he would not say that Charles' decisions up until July "were intelligently made," but James nevertheless discussed farming decisions with Charles up until July.

On January 29, 2015, the court ruled on the pending fee applications in a written order. Pertinent here, the court approved Whitmore's attorney fees in full and ordered that $18,790.12 be

paid to Whitmore and $9,000 be paid to James. Addressing Heritage Bank's objections, the court found that the parties' stipulation to the appointment of a conservator was an admission of the statutory requirements for the appointment. The court further found that the appointment of a conservator "provided clear evidence" that the petition was brought in good faith. The court found that although no guardian was appointed, the petition for a guardianship was not filed in bad faith "as it cleared the confusion surrounding [Charles'] care in part created by his execution of two power of attorney agreements." Additionally, the court found that although Whitmore's services "covered an umbrella of entities, none of those services were completely unrelated to the interest of Charles L. Gabel." The court found that the fees were fair, reasonable, and supported by the evidence.

Heritage Bank timely appealed to this court.

ASSIGNMENTS OF ERROR

Summarized and renumbered, Heritage Bank assigns that the county court erred in awarding fees because (1) the guardianship petition was unsuccessful, (2) the court did not make the statutory findings necessary for the appointment of a conservator, and (3) the petition for guardianship and conservatorship was not filed in good faith; Heritage Bank also assigns that (4) the county court erred in calculating the amount of attorney fees to be paid because Jeri and James' application for fees included fees for legal services that were unrelated to the conservatorship and were "personal to James." Brief for appellant at 3.

Relying on *Guynn v. Guynn*, 2011 UT App 206, 265 P.3d 801, Heritage Bank also argues that the county court erred in awarding fees because the parties' stipulation to the appointment of Heritage Bank as conservator was silent on the issue of liability for fees. Because Heritage Bank did not raise this issue below and does not specifically assign error on this basis, we decline to address this argument. See *Watson v. Watson*, 272 Neb. 647, 659, 724 N.W.2d 24, 33 (2006) ("In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court."); *Harris v. Harris*, 261 Neb. 75, 81, 621 N.W.2d 491, 497 (2001) ("Errors argued but not assigned will not be considered on appeal.").

STANDARD OF REVIEW

An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record made in the county court. *In re Guardianship of Benjamin E.*, 289 Neb. 693, 856 N.W.2d 447 (2014). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal absent an abuse of discretion. *In re Estate of Stull*, 261 Neb. 319, 622 N.W.2d 886 (2001).

ANALYSIS

The general rule under Nebraska law is that attorney fees and costs may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has

been to allow recovery of attorney fees. *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d 839 (2001). Pertinent here, Neb. Rev. Stat. § 30-2654(a)(2) (Reissue 2008) provides that a "conservator is to expend or distribute sums reasonably necessary for the support, education, care or benefit of the protected person." In *Donley*, the Nebraska Supreme Court held that "the cost of initiating a good faith petition for the appointment of a guardian or conservator, where such appointment is determined to be in the best interests of the protected person, constitutes a necessary expenditure on behalf of the protected person." 262 Neb. at 289, 631 N.W.2d at 845. Accordingly, the Supreme Court held that such costs, including reasonable attorney fees, are compensable out of a protected person's estate pursuant to § 30-2654(a)(2). *Id.* As applied here, the rule from *Donley* means that the costs Jeri and James incurred pursuing the petition for a guardianship and conservatorship were compensable out of Charles' estate if the petition was brought in good faith and the appointment was determined to be in Charles' best interests.

*Success of Guardianship Petition.*

Heritage Bank argues that under the rule from *Donley*, the attorney fees that Jeri and James incurred pursuing a guardianship were not compensable out of Charles' estate because the petition for a guardianship was unsuccessful. The bank contends that either the entire fee application should be denied or, "[a]t a minimum, one half of the fee request of $27,790.12 should be attributed to the guardianship application and be denied due to its failure to have a guardian appointed." Brief for appellant at 13.

Jeri and James respond that the fees were compensable because the only consideration under *Donley* is whether a guardianship petition was initiated in good faith, regardless of whether it resulted in an appointment. Jeri and James also argue that the guardianship petition was successful because they achieved their objective of obtaining a neuropsychological evaluation of Charles.

A brief recap of the relevant procedural background is helpful. On April 18, 2014, the date the petition for a guardianship and conservatorship was filed, the court entered an ex parte order appointing Jeri temporary guardian, which the court was permitted to do pursuant to Neb. Rev. Stat. § 30-2626(a) (Cum. Supp. 2014) upon finding that Charles had no guardian and that an emergency existed. Jeri's temporary guardianship terminated on May 16, 2014, when the court entered an order reflecting the parties' agreement that Jeri's request for a temporary guardian would be denied and the letters of temporary guardianship issued to her would terminate. After May 16, Jeri and James took no further action in pursuit of a guardianship for Charles.

Viewing Whitmore's itemized invoice in light of this procedural background, we conclude that the court did not abuse its discretion in awarding attorney fees incurred pursuing the guardianship prior to Jeri's appointment as temporary guardian on April 18, 2014. Nothing in the record suggests that the ex parte order appointing Jeri temporary guardian was improper; indeed, as the trial court found, there was confusion surrounding Charles' care arising out of his execution of at least two powers of attorney, the most recent of which was executed after he was diagnosed with Alzheimer's. Thus, there was a reasonable basis for pursuing a guardianship, and at least initially the petition was successful in that it resulted in the appointment of Jeri as temporary

guardian. Any fees incurred prior to Jeri's appointment on April 18 were compensable out of Charles' estate.

With respect to attorney fees incurred pursuing a permanent guardianship after April 18, 2014, but prior to May 16, 2014, the situation is less clear. On May 16, Jeri's appointment as temporary guardian terminated upon the parties' agreement that the guardianship portion of Jeri's petition would be denied. Thus, any fees incurred pursuing a permanent guardianship between April 18 and May 16 were incurred pursuing an unsuccessful guardianship. However, given that Jeri filed a single petition seeking a guardianship and conservatorship for Charles, any fees incurred pursuing Jeri's petition during this period were also incurred pursuing a successful conservatorship. In light of this fact, and given that it would be difficult to separate the fees incurred pursuing the guardianship from those incurred pursuing the conservatorship, we conclude that the court acted within its discretion in awarding the attorney fees incurred between April 18 and May 16. We note that the fees incurred pursuing the petition during this period constitute a very small percentage of the total fees awarded; the record certainly does not support Heritage Bank's contention that half of Whitmore's requested fees should be attributed to the "unsuccessful" guardianship petition and should therefore be denied.

*Statutory Findings for Conservatorship.*

Heritage Bank also argues that the attorney fees incurred pursuing the conservatorship petition were not compensable out of Charles' estate under the rule from *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d 839 (2001), because the court never made the findings necessary for the appointment of a conservator. Specifically, Heritage Bank contends that "[t]here was no stipulation by the parties or finding by the Court that Charles' assets would be 'wasted or dissipated' in the absence of the appointment of a conservator." Brief for appellant at 17. Heritage Bank contends that this "'wasted or dissipated' finding is required by statute, and it is required to be found by clear and convincing evidence." Brief for appellant at 17. It argues that without such a finding, "the conservatorship cannot be found to be necessary" and, consequently, "no fees can be necessary." Brief for appellant at 17.

This argument is unusual in light of the fact that Heritage Bank accepted its appointment as conservator and took significant steps to fulfill its duties in that role. Notably, during its time as conservator, Heritage Bank arranged for the fulfillment of the ADM grain contracts, negotiated the return of the combine to AGCO, and paid down MCGFF's debt to Cornerstone. Together, these actions prevented the loss of hundreds of thousands of dollars from Charles' estate by avoiding (1) cancellation of the grain contracts, (2) a deficiency judgment in the combine dispute, and (3) a trustee's sale of the farm real estate. It is against this backdrop that Heritage Bank argues that attorney fees incurred pursuing the conservatorship were not compensable out of Charles' estate because the court did not find that Charles' assets would be "wasted or dissipated" if a conservator was not appointed.

Pursuant to Neb. Rev. Stat. § 30-2630(2) (Reissue 2008), a court may appoint a conservator if it is satisfied by clear and convincing evidence that (1) the person is unable to manage his property and property affairs effectively for reasons such as mental illness, mental deficiency,

physical illness or disability, or other reasons, and (2) the person has property which will be wasted or dissipated unless proper management is provided.

In its August 26, 2014, order appointing Heritage Bank conservator in accordance with the parties' agreement, the court stated that the "factual basis for the appointment of [a] conservator is that Charles Gabel agrees he is unable to manage his property and property affairs effectively." Given that the court was appointing Heritage Bank conservator pursuant to the parties' agreement, we cannot say that this "factual basis" was insufficient under § 30-2630(2). Notably, Heritage Bank has not cited any authority, and our research has uncovered none, requiring the court to make the findings outlined in § 30-2630(2) where, as here, the parties agree to the appointment of a conservator. In stating the "factual basis" for the appointment, the court was simply pointing out one of the disputed issues that Charles had conceded; we do not believe the appointment was improper simply because the court did not provide a more detailed factual basis.

Furthermore, especially in light of the financial turmoil facing Charles' estate at the time of Heritage Bank's appointment, it is reasonable to infer that by conceding he was unable to manage his property or property affairs, Charles was also conceding that his assets would be wasted or dissipated unless a conservator was appointed. Otherwise, it would have been unnecessary for Charles to agree to the appointment of a conservator, as someone else, such as an attorney in fact appointed under a power of attorney, could have handled Charles' property affairs. While Moyer testified at the hearing on attorney fees that a conservatorship was unnecessary because Charles had an attorney in fact and an attorney at law who were capable of managing his affairs, this testimony is difficult to square with the evidence of the financial difficulties that developed during the time Jolene allegedly was acting as Charles' attorney in fact. Nothing in the record suggests Jolene was capable of resolving the financial problems facing Charles' estate; indeed, the evidence suggests the opposite.

Under these circumstances, we do not believe the court was required to state as an additional "factual basis" for the appointment of Heritage Bank as conservator that Charles' assets would be wasted or dissipated if a conservator was not appointed. We see no reason why the parties' stipulation alone was not sufficient for the appointment, and any doubt surrounding the need for a conservator is eliminated when one considers the financial turmoil facing Charles' estate at the time of the appointment and Heritage Bank's subsequent actions as conservator, which clearly were necessary to avoid significant monetary losses to the estate.

In a related argument, Heritage Bank contends that the parties' stipulation for the appointment of it as conservator was not an admission to the statutory requirements but a way for Charles to avoid further litigation costs. There is nothing in the record to support this argument, and we reject it. Significantly, the "factual basis" for the appointment provided by the trial court said nothing about Charles wishing to avoid further litigation costs; it merely stated that Charles, who was represented by counsel, conceded that he was "unable to manage his property and property affairs effectively."

*Bad Faith in Filing Petition.*

Heritage Bank also argues that it was error to grant Jeri and James' application for fees under the rule from *In re Guardianship & Conservatorship of Donley*, 262 Neb. 282, 631 N.W.2d

- 10 -

839 (2001), because the petition was not filed in good faith but, rather, for James' benefit after James "had inextricably bound Charles to his own financial affairs." Brief for appellant at 18. The bank contends that in pursuing the guardianship and conservatorship, James sought to "control Charles' affairs even though Charles was competent," in part because James could not obtain financing without Charles' backing. Brief for appellant at 18. According to the bank, James believed that success on the petition would ensure that Charles and Jolene had no say in the farm operation.

Jeri and James respond that James' actions were appropriate and aimed to protect Charles and preserve Charles' estate from "Jolene's destructive actions." Brief for appellees at 19. In response to the bank's claim that James was self-serving and sought to retain control of the farm in himself, Jeri and James point out that James agreed to the appointment of an independent conservator.

Based on the record before us, we cannot share Heritage Bank's view that Jeri and James pursued the petition for guardianship and conservatorship in bad faith. As the county court reasoned, it would be very difficult to conclude that the petition was filed in bad faith where it resulted in the appointment of Heritage Bank as conservator, especially where Charles' estate was at risk of losing large sums of money at the time of the bank's appointment.

Furthermore, to suggest that James acted solely out of self-interest in pursuing a guardianship and conservatorship for Charles in the face of these financial troubles is to ignore that Charles and James had jointly owned and operated the farming enterprise for many years. Given Charles and James' joint ownership of the various entities that made up the enterprise, it is apparent that the failure to resolve the farm's financial troubles would have been detrimental to both Charles and James. We decline to speculate that James was motivated entirely by self-interest when he and Jeri pursued the guardianship and conservatorship.

Nor can we speculate that Charles was competent or that James "used the petition for conservatorship to wrest control" of the farm from his otherwise competent father. Brief for appellant at 20. As Jeri and James point out, they agreed to the appointment of an independent third party as conservator, which contradicts Heritage Bank's contention that James sought to retain control of the farm operation in himself. Furthermore, because the parties stipulated to the appointment of a conservator, the record contains sparse evidence as to Charles' competency or lack thereof. We note that after Charles underwent the court-ordered neuropsychological evaluation, the results of which are not in the record, the parties agreed to the appointment of Heritage Bank a conservator, and the court accepted the agreement; these actions are not consistent with a diagnosis of mental competency.

In summary, we have concluded that (1) the petition for guardianship was successful insofar as it resulted in the ex parte appointment of Jeri as temporary guardian, and the court acted within its discretion in awarding fees incurred after Jeri's appointment on April 18, 2014, but before the guardianship portion of the petition was dismissed on May 16, 2014; (2) the petition for conservatorship was successful in that it resulted in the appointment of Heritage Bank as conservator; and (3) Jeri and James pursued the petition for guardianship and conservatorship in good faith and in Charles' best interests. Accordingly, under the rule from *Donley*, the court's decision to order the payment of Whitmore's attorney fees out of Charles's estate conformed to

the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. We now turn to Heritage Bank's challenge to the amount of attorney fees awarded.

*Fees for Unrelated Legal Services.*

Heritage Bank argues that the county court erred in calculating the amount of attorney fees to be paid because Jeri and James' application included fees "for services having nothing to do with obtaining a conservator for Charles," including services performed for James, MCGFF, or Core Bank in connection with the ADM grain contracts, the bankruptcies, and the AGCO replevin action. Brief for appellant at 15. The bank contends that these services were "personal to James" and "alien" to Charles, his estate, his trust, and his conservatorship. Brief for appellant at 14, 16. The bank contends that "[a]s a result, the fees as a whole should be denied." Brief for appellant at 16.

Jeri and James respond that all of Whitmore's services and fees were related to the conservatorship and were compensable out of Charles' estate. For example, they contend that Whitmore's services "were crucial to the recovery of the half million dollar value" of the ADM grain contracts. Brief for appellees at 31. They support their argument with a citation to Neb. Rev. Stat. § 30-2643 (Reissue 2008), which they contend permits the "reasonable fees and costs of an attorney" to be paid from a protected person's estate in conservatorship matters. Brief for appellees at 33.

Before addressing Heritage Bank's specific argument, we clarify the scope of the issue before us. Heritage Bank has not assigned as error that the county court lacked statutory authority to grant Jeri and James' application insofar as it sought payment of attorney fees that were not specifically related to the pursuit of a guardianship or conservatorship, nor did it object to Jeri and James' application on this basis in the county court. Instead, Heritage Bank assigns and argues that the county court abused its discretion in calculating the amount of fees to be paid out of Charles' estate because some of the fees were incurred for services unrelated to the pursuit of a conservatorship. Thus, insofar as Jeri and James' application involved a request for attorney fees that were not specifically related to the pursuit of a guardianship or conservatorship, we express no opinion on whether the request was procedurally proper under § 30-2643 or whether the court's order was otherwise statutorily authorized. We consider only Heritage Bank's argument that the county court abused its discretion in fashioning its final fee award.

In considering the attorney fee application, the county court reasoned that although Whitmore's services "covered an umbrella of entities, none of those services were completely unrelated to the interest of Charles L. Gabel." The court found that all of the fees included in the invoice attached to Jeri and James' application were fair, reasonable, and supported by the evidence. As explained below, we cannot say that the county court abused its discretion in reaching this conclusion under the circumstances.

When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Estate of Stull*, 261 Neb. 319, 622 N.W.2d 886 (2001). The factors relevant to determining a reasonable attorney fee include (1) the services actually performed, (2) the amount in controversy, (3) the nature of the case, (4) the results obtained, (5) the extent of preparation of the case, (6) the

difficulty of the questions involved, (7) the skill required, (8) the customary charges of the bar for similar work, and (9) the character and standing of the attorney. *Id*. An abuse of discretion exists when the reasons or rulings of the trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Schirber v. State*, 254 Neb. 1002, 581 N.W.2d 873 (1998).

When Core Bank was appointed temporary conservator, just as when Heritage Bank was appointed permanent conservator approximately three months later, Charles' estate faced significant financial troubles related to the ADM grain contracts, the AGCO replevin action, and the Cornerstone foreclosure proceedings. Whitmore testified that his invoice included fees for services performed for Core Bank following its appointment as temporary conservator. Whitmore explained that he prepared a settlement offer in the combine dispute and obtained Core Bank's approval of it. Whitmore further testified that he attended hearings in the bankruptcies filed by Core Bank on behalf of MCGFF and the Trust and corresponded with James, Jeri, and Core Bank about the bankruptcy proceedings. While on cross-examination Whitmore was less than clear when explaining exactly for whom he provided these services, the essence of his testimony was clear: Charles' estate was in financial turmoil and Whitmore was trying to resolve the issues facing the estate by working with Jeri, James, Core Bank, and other persons. For various reasons, the financial difficulties facing Charles' estate were not resolved until after Heritage Bank was appointed permanent conservator; however, this does not mean that Whitmore's services were unrelated to the conservatorship or to protecting Charles' estate.

Heritage Bank also contends that Whitmore's services in relation to the ADM grain contracts, the AGCO replevin action, and the Cornerstone foreclosure proceedings benefited James, not Charles. Again, this argument ignores that James' and Charles' financial interests were intertwined by virtue of their joint ownership of the various entities that made up the farm enterprise. We cannot speculate that Whitmore was acting out of concern for James' interests, rather than for Charles' interests, when he provided the services included in the invoice.

Addressing the limited issue before us, we cannot say that the court abused its discretion in awarding all of the fees that Jeri and James sought in their application. The fees were incurred in attempting to save Charles' estate from significant financial losses. Macnamara, an attorney with years of experience in this area, testified that the attorney fees reflected in Whitmore's invoice were reasonable and proper in light of all of the relevant factors. The only conflicting evidence was Moyer's opinion that a conservatorship was unnecessary and that Core Bank did not need to file the bankruptcies on behalf of MCGFF and the Trust. However, as we have already explained, Moyer's testimony was difficult to square with the evidence of financial difficulty facing Charles' estate at the time the court appointed a conservator. Furthermore, the county court was familiar with the case, the parties involved, and the attorneys, and was in the best position to resolve conflicts in the evidence and evaluate the witnesses' credibility.

## CONCLUSION

For the foregoing reasons, we affirm the county court's January 29, 2015, order granting Jeri and James' application for payment of attorney fees out of Charles' estate.

AFFIRMED.